**IN THE UNITED STATES BANKRUPTCY COURT**
**Eastern District of Arkansas**

In re:   Eaton Moery Environmental Services, Inc.
        Chapter 11                       Case No. <u>2:10-bk-14713</u>

## MOTION AUTHORIZING USE OF CASH COLLATERAL AND TO INCUR SECURED DEBT

      Debtor-in-Possession, Eaton Moery Environmental Services., by and through its counsel, James F. Dowden, PA, respectfully moves this Court for entry of an order authorizing use of Cash Collateral.  The Debtor respectfully represents as follows:

      1.     Venue and jurisdiction are proper in this Court.

      2.     On June 30, 2010, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

      3.     The Debtor continues in the possession of its property and the management of its respective business as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

      4.     No trustee, examiner, or committee has been appointed in the Debtor's Chapter 11 cases.

      5.     Debtor is a corporation responsible for collection and management of refuge and debris, i.e., garbage, in Eastern Arkansas.

      6.     The Debtor is in need of additional working capital and funds to achieve at least two goals, which are to:

        a)     Acquire land in Shelby County, Tennessee to capitalize on market opportunities in that area and,

        b)     Raise funds for working capital needs including, but not limited to, real estate taxes, commercial containers, and truck lease deferrals.

      7.     Debtor is currently unable to borrow money from any source on a secured or unsecured basis, but prays for authority to borrow from Paragon Financial Group, Inc., ("Paragon") a full service invoice factoring company (since 1994) based in Florida.

      8.     The borrowing proposed herein is outlined in the term sheet attached hereto as Exhibit A. The actual loan document and security agreement are attached as Exhibit B.

      9.     The lending proposal involves factoring the Debtor's Accounts Receivable ("A/R").  The average outstanding A/R balance for Debtor is $700,000.  Thus, at 85% advance rate, Debtor expects to have $563,500 available for funding the proposes outlined herein.

10.     The proposal requires the Debtor to pay $9,000 for due diligence and lender's attorney fees. Debtor hereby requests Court authority to make this non-refundable disbursement.

11.     As is standard in such DIP lending, Paragon requires a first lien on Debtor's Accounts Receivable. The A/R clearly constitutes collateral for the bondholders for whom the Bank of the Ozarks serves as Trustee. The current outstanding debt on the bonds is approximately $4.4 million. Debtor asserts the bondholders are adequately protected due to additional security which collateralizes this debt in the form of $6,850,000 of real estate as set forth in great detail in Debtor's schedules. The Paragon loan would prime Bank of the Ozarks, Trustee, as to the extent of their lending on A/R, but Bank of the Ozarks, Trustee, would be adequately protected due to the above-described equity cushion.

12.     On or about February 22, 2010, a group of note-holders bolding notes dated May 2008 in varying amounts, totaling $800,000, took a security interest in certain assets of the Debtor's, including A/R. The note-holders were or are stockholders, and thus, insiders. Attached as Exhibit C is a list of the note-holders and debts owed them. The taking of a security interest occurred at a time when the persons listed on Exhibit C, or their agent, Steve Nelson, controlled the day-to-day operations of the Debtor. This also occurred at a time when the Debtor was unquestionably insolvent. It also improved the note-holders' positions from unsecured to secured creditors, thus permitting them to receive more by the transfer than they would have received in the event of a Chapter 7 bankruptcy. The subject note-holders granted themselves a classic "insider preference."

13.     Debtor further alleges the persons on Exhibit C are contributors of capital, entitled to equity in the Debtor, but are not in fact creditors. Regardless of the foregoing, and in the event they are deemed legitimate holders of debt, the persons on Exhibit C are adequately protected as they also possess a secured interest in the equipment on Schedule B of Debtor's filing, which values equipmetn in excess of $2 million.

14.     In order to resolve a case pending in Shelby County, Tennessee, an escrow agreement was entered attached hereto as Exhibit D, permitting Debtor to purchase real estate critical to its operation, for $150,000 to be paid in three increments of $50,000 due July, August, and September of 2010. Debtor has been unable to fulfill the terms of this order due to lack of funds. Thus, $150,000 of the borrowing requested in this motion will be dedicated to purchasing the real estate described in Exhibit D.

15.     Paragon is willing to enter into this agreement after a Court hearing, and will have a representative present at the DIP hearing to more fully explain the procedures and requirements of the lending.

16.     It is anticipated, should the loan be approved within these parameters, Paragon will be paid its fees, complete its due diligence, and being funding within thirty days.

17.     Absent this relief, Debtor will be unable to capture the revenue associated with serving its largest customer (located in Memphis) and further, it will be difficult, if not impossible, to create enough cash-flow to continue to service the secured creditors and/or create a replayment plan for unsecured creditors.

18.     Accordingly, Debtor believes the entry of an order authorizing the use of cash collateral, and authorizing the Debtor to incur secured debt through this DIP lending, is in the best interest of the Debtor and its creditors.

WHEREFORE, the Debtor respectfully requests that the Court set this smatter for hearing and enter an Order approving this motion, and granting such other and further relief as is just and proper.

Respectfully submitted,

/s/ James F. Dowden
James F. Dowden, Esq.
Counsel for Debtor
212 Center Street, Tenth Floor
Little Rock, Arkansas  72201
501-324-4700
Facsimile 501-374-5463
JFDowden@swbell.net

**CERTIFICATE OF SERICE:**
**I certify that a copy of this motion has been served on all required parties on this 26th day of October, 2010.**

/s/ James F. Dowden



July 13, 2010

<u>**SENT VIA E-MAIL**</u>

Mr. Glen Eaton
Eaton Moery Environmental Services, Inc. (Debtor In Possession)
1784 Hwy 1 North
Wynne, AR 72396

RE: Factoring Facility

Dear Glen:

We are pleased to express our interest in considering the credit accommodations described below. This letter is not intended to constitute a commitment to fund on our part, rather, this letter is an outline, in summary format, of the major points of understanding which will be the basis of the final documentation of an agreement, to be drafted by us.

1.  **Guarantors:** All shareholders holding 10% or more ownership.

2.  **Advance Rate:** 85.00% of the net invoiced amount.

3.  **Factoring Fee:** 1.55% per 30 day period.

4.  **Funds Usage Rate:** A funds usage fee equal to three percent over Prime Rate. The Prime rate is what which appears in the rate section of the Wall Street Journal on the 1st day of each calendar month (with a floor of 7.00%).

5.  **Minimum Factoring Volume:** None.

6.  **Initial Factoring Line:** $1,000,000.00

7.  **Term of Agreement:** 12 months

8.  **Receivable Eligibility:** All invoices submitted for factoring must be billed in arrears, due and payable in less than 60 days from invoice date and verified to Paragon's satisfaction.

9.  **Invoice Submission Requirements:** Copies of invoices (faxes and email are acceptable) along with the following (where applicable):

    - Signed rate agreements/purchase orders/contracts
    - Proof of delivery to customer
    - All invoices must have proper notice of assignment language directing payment to Paragon at its lockbox.
    - Invoices may be required to be submitted electronically in a form that can be uploaded in to our factoring software.

10. **Collateral:** A minimum of first security interest in accounts receivable and proceeds.

11. **Reserve Disbursement Policy:** When an invoice is paid, eligible reserves can be disbursed the following week that payment is received. Our policy is to disburse reserves once per week based on the previous week's collections.

12. **Conditions:**

    1. Paragon must be granted a super priority lien by the bankruptcy court. All documentation, motions, filings, and similar will be reviewed by Paragon's counsel and must be in a form acceptable to us.

    2. All payments of invoices will be sent from your customers to Paragon Financial. Your clients' invoices shall be legended directing payment to such address.

*Exhibit*

3. All customers submitted for factoring are subject to credit approval by Paragon.

4. Your providing us with quarterly 941 payroll tax reports, sales tax reports, and proof of payment. All taxes must be kept current.

5. Our review and satisfaction with the company's accounting and reporting systems, credit and collection practices, and documentation procedures.

6. Minimum invoice size that can be factored is $250.00

7. Eaton Moery Environmental Services, Inc. represents that there are no outstanding Environmental Protection Agency issues or complaints.

11. **Management Reports:** Detailed web-based management reporting. Online access fee is $50 per month.

12. **Background Searches:** This includes UCC, Tax Lien, Judgment Searches, and similar. $550.00 due when the Factoring Agreement is signed.

13. **Line Fee:** Waived.

14. **Attorney Fees Deposit and Expenses:** Eaton Moery Environmental Services, inc. will reimburse Paragon for all out-of-picket expenses, including but not limited to legal, travel, set-up and termination costs, incurred by Paragon in connection with the Factoring Agreement, whether or not the agreement is completed or finalized. There will be significant attorney fees incurred by Paragon in order to provide factoring for the Debtor In Possession. Therefore, an upfront, non-refundable deposit of $9,000 is required and immediately due.

15. **Monthly Monitoring Fee of Chapter 11:** Upon closing of this transaction, there will be monitoring required by Paragon's counsel. It is anticipated this will be approximately $500-750 per month and charged to the reserve account.

16. **Security Interest.** You hereby grant us a security interest in the Collateral securing your obligations hereunder, including but not limited to the payment of the fees and expenses set for herein.

All other terms and conditions will be expressed in the Factoring and Security Agreement that will accompany our closing documents. Upon acceptance of the above terms, Paragon will proceed immediately by engaging counsel and drafting the closing documents. We look forward to working with you. Please call or email with any questions.

Very truly yours,
PARAGON FINANCIAL GROUP, INC.

Jon Anselma
Managing Partner

Agreed and Accepted By:
Eaton Moery Environmental Services, Inc.

_____
Glen Eaton

## FACTORING AND SECURITY AGREEMENT

THIS FACTORING AGREEMENT is made as of <u>April 6, 2010</u> by and between ABC CORP, a Delaware corporation ("Seller") and PARAGON FINANCIAL GROUP, INC., a Florida corporation ("Purchaser").

1. **Sale; Purchase Price; Billing; Reserve.**

    1.1. **Assignment and Sale.**

        1.1.1. Seller shall offer to sell to Purchaser as absolute owner such of Seller's Accounts as are listed from time to time on a Schedule of Accounts.

        1.1.2. Each Schedule of Accounts shall be accompanied by such documentation supporting and evidencing the Account as Purchaser shall from time to time request.

        1.1.3. Purchaser shall purchase from Seller such Accounts as Purchaser determines to be Eligible Accounts, so long as the Balance Subject to Funds Usage Fee does not exceed, before and after such purchase, the Maximum Amount.

        1.1.4. Purchaser shall pay the Purchase Price, less any amounts due to Purchaser from Seller, including, without limitation, any amounts due under Section 1.3.2 hereof, of any Purchased Account, to Seller's Deposit Account within one (1) Business Day of the Purchase Date, whereupon such Account shall be deemed purchased hereunder.

    1.2. **Billing.**  Purchaser may send a monthly statement to all Account Debtors itemizing their account activity during the preceding billing period.  All Account Debtors will be instructed to make payments to Purchaser.

    1.3. **Reserve Account.**

        1.3.1. Purchaser may apply a portion of any Purchase Price to the Reserve Account in the amount of the Reserve Shortfall.

        1.3.2. Seller shall pay to Purchaser on demand the amount of any Reserve Shortfall.

        1.3.3. Purchaser shall pay to Seller upon Seller's request, any amount by which the Reserve Account exceeds the Required Reserve Amount.

        1.3.4. Purchaser may charge the Reserve Account with any Obligation, including any amounts due from Seller to Purchaser hereunder.

        1.3.5. Purchaser may pay any amounts due Seller hereunder by a credit to the Reserve Account.

2. **Authorization for Purchases.**  Subject to the terms and conditions of this agreement, Purchaser is authorized to purchase Accounts upon telephonic, facsimile, or other instructions received from anyone purporting to be an officer, employee, or representative of Seller.

Initial_____



3. **Fees and Expenses**.  Seller shall pay to Purchaser:

   3.1. **Factoring Fees**.

      3.1.1. Funds Usage Fee.

         3.1.1.1. A Funds Usage Fee, earned daily, to be paid on the date on which a Purchased Account is paid in full or repurchased.

         3.1.1.2. Notwithstanding Section 3.1.1.1, the Funds Usage Fee shall not accrue and be payable on any funds subject to the Default Charge.

      3.1.2. Service Charge.  The service Charge, payable on the date on which a Purchased Account is paid in full or repurchased, payable in consideration of the rendering of the Credit and Collection Services.

   3.2. **Other Fees**.

      3.2.1. Misdirected Payment Fee.  any Misdirected Payment Fee immediately upon its accrual.

      3.2.2. Default Charge.  the Default Charge, immediately upon its accrual, on:

         3.2.2.1. all past due amounts due from Seller to Purchaser hereunder; and

         3.2.2.2. the amount of any Reserve Shortfall.

      3.2.3. Early Termination Fee.  the Early Termination Fee if Seller terminates this agreement prior to a termination date set forth in Section 13.

      3.2.4. Missing Notation Fee.  The Missing Notation Fee on any Invoice that is sent by Seller to an Account Debtor which does not contain the notice as required by Section 8.3 hereof.

   3.3. **Reimbursable Expenses**.  The expenses directly incurred by Purchaser in the administration of this agreement such as wire transfer fees, overnight mail delivery, check certification, UCC filing and search fees, and audit fees.  These fees are due immediately upon payment by Purchaser.

4. **Repurchase Of Accounts**.

   4.1. Purchaser may require that Seller repurchase, by payment of the unpaid Face Amount thereof together with any unpaid fees relating to the Purchased Account on demand, or, at Purchaser's option, by Purchaser's charge to the Reserve Account:

      4.1.1. any Purchased Account, the payment of which has been disputed by the Account Debtor obligated thereon, Purchaser being under no obligation to determine the bona fides of such dispute;

Initial_____

4.1.2. Any Purchased Account for with Seller has breached its warranty under Section 11 hereunder.

4.1.3. Any Purchased Account owing from an Account Debtor which in Purchaser's reasonable credit judgment has become insolvent.

4.1.4. all Purchased Accounts upon the occurrence of an Event of Default, or upon the effective date of termination of this agreement;

4.1.5. any Purchased Account which remains unpaid beyond the Late Payment Date.

4.2. The repurchase of a Purchased Account shall not constitute a reassignment thereof and Purchaser shall retain its security interest therein.

5. **Clearance Days**. For all purposes under this agreement, Clearance Days will be added to the date on which any payment is received by Purchaser.

6. **Security Interest**.

6.1. To secure payment and performance of the Obligations, Seller grants to Purchaser a continuing first priority security interest in and to the Collateral.

6.2. Notwithstanding the creation of the above security interest, the relationship of the parties shall be that of Purchaser and Seller of accounts, and not that of lender and borrower.

7. **Authorization to Purchaser**.

7.1. Seller hereby irrevocably authorizes Purchaser and any designee of Purchaser, at Seller's sole expense, to exercise at any times in Purchaser's or such designee's discretion all or any of the following powers until all of the Obligations have been paid in full: (a) receive, take, endorse, assign, deliver, accept and deposit, in the name of Purchaser or Seller, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to the Collateral or the proceeds thereof, (b) take or bring, in the name of Purchaser or Seller, all steps, actions, suits or proceedings deemed by Purchaser necessary or desirable to effect collection of or other realization upon the accounts and other Collateral, (c) after an Event of Default, change the address for delivery of mail to Seller and to receive and open mail addressed to Seller, (d) after an Event of Default, extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all accounts or other Collateral which includes a monetary obligation and discharge or release any account debtor or other obligor (including filing of any public record releasing any Lien granted to Seller by such account debtor), without affecting any of the Obligations, (e) execute in the name of Seller and file against Seller in favor of Purchaser financing statements or amendments with respect to the Collateral, (f) pay any sums necessary to discharge any Lien or encumbrance which is senior to Purchaser's security interest in the Collateral, which sums shall be included as Obligations hereunder, and in connection with which sums the Late Charge shall accrue and shall be due and payable, and (g) file in the name of Seller or Purchaser or both (1) mechanics lien or related notices, or (2) claims under any payment bond, in connection with goods or services sold by Seller in connection with the improvement of realty, (h) at any time, irrespective

Initial_____

of whether an Event of Default has occurred, without notice to or the assent of Seller, notify any Account Debtor obligated with respect to any Account, that the underlying Account has been assigned to Purchaser by Seller and that payment thereof is to be made to the order of and directly and solely to Purchaser, and (i) communicate directly with Seller's Account Debtors to verify the amount and validity of any Account created by Seller.

7.2. Seller hereby releases and exculpates Purchaser, its officers, employees and designees, from any liability arising from any acts under this agreement or in furtherance thereof whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for willful misconduct. In no event will Purchaser have any liability to Seller for lost profits or other special or consequential damages. Without limiting the generality of the foregoing, Seller releases Purchaser from any claims which Seller may now or hereafter have arising out of Purchaser's endorsement and deposit of checks issued by Seller's customers stating that they were in full payment of an account, but issued for less than the full amount which may have been owed on the account.

7.3. Seller authorizes Purchaser to accept, endorse, and deposit on behalf of Seller any checks tendered by an account debtor "in full payment" of its obligation to Seller. Seller shall not assert against Purchaser any claim arising therefrom, irrespective of whether such action by Purchaser effects an accord and satisfaction of Seller's claims, under §3-311 of the UCC, or otherwise.

7.4. ACH Authorization. In order to satisfy any of the Obligations, Purchaser is hereby authorized by Seller to initiate electronic debit or credit entries through the ACH system to Seller's Account or any other deposit account maintained by Seller wherever located. Seller may only terminate this authorization by giving Purchaser thirty (30) days prior written notice of termination.

8. **Covenants By Seller**.

8.1. After written notice by Purchaser to Seller, and automatically, without notice, after an Event of Default, Seller shall not, without the prior written consent of Purchaser in each instance, (a) grant any extension of time for payment of any of the Purchased Accounts, (b) compromise or settle any of the Purchased Accounts for less than the full amount thereof, (c) release in whole or in part any Account Debtor, or (d) grant any credits, discounts, allowances, deductions, return authorizations, or the like with respect to any of the Purchased Accounts.

8.2. From time to time as requested by Purchaser, at the sole expense of Seller, Purchaser or its designee shall have access, during reasonable business hours if prior to an Event of Default and at any time if on or after an Event of Default, to all premises where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including Seller's books and records, and Seller shall permit Purchaser or its designee to make copies of such books and records or extracts therefrom as Purchaser may request. Without expense to Purchaser, Purchaser may use any of Seller's personnel, equipment, including computer equipment, programs, printed output and computer readable media, supplies, and premises for the collection of Accounts and realization on other Collateral as Purchaser, in

Initial_____

its sole discretion, deems appropriate. Seller hereby irrevocably authorizes all accountants and third parties to disclose and deliver to Purchaser at Seller's expense all financial information, books and records, work papers, management reports, and other information in their possession relating to Seller.

8.3. Before sending any invoice evidencing a Purchased Account to the Account Debtor, Seller shall mark same with the a notice of assignment as may be required by Purchaser.

8.4. Seller shall pay when due all payroll and other taxes and shall provide proof thereof to Purchaser in such form as Purchaser shall reasonably require.

8.5. Seller shall not create, incur, assume, or permit to exist any Lien upon or with respect to any Collateral now owned or hereafter acquired by Seller.

8.6. Seller shall maintain insurance on all insurable property owned or leased by Seller in the manner, to the extent and against at least such risks (in any event, including but not limited to fire and business interruption insurance) as usually maintained by owners of similar businesses and properties in similar geographic areas. All such insurance shall be in amounts and form and with insurance companies acceptable to Purchaser in its sole discretion. Seller shall furnish to Purchaser: (a) upon written request, any and all information concerning such insurance carried; (b) as requested by Purchaser, lender loss payable endorsements (or their equivalent) in favor of Purchaser. All policies of insurance shall provide for not less than thirty (30) days prior written cancellation notice to Purchaser.

8.7. Notwithstanding that Seller has agreed to pay the Misdirected Payment Fee pursuant to Section 3.2.1 hereof, Seller shall deliver in kind to Purchaser on the next Business Day following the date of receipt by Seller of the amount of any payment on account of a Purchased Account.

8.8. **Avoidance Claims.**

8.8.1. Seller shall indemnify Purchaser from any loss arising out of the assertion of any Avoidance Claims shall pay to Purchaser on demand the amount thereof.

8.8.2. Seller shall notify Purchaser within two Business Days of its becoming aware of the assertion of an Avoidance Claim.

8.8.3. This Section shall survive the termination of this agreement.

9. **Account Disputes**. Seller shall notify Purchaser promptly of and, if requested by Purchaser, will settle all disputes concerning any Purchased Account, at Seller's sole cost and expense.

10. **Perfection of Security Interest**. Seller shall execute and deliver to Purchaser such documents and instruments, including, without limitation, UCC financing statements, as Purchaser may request from time to time in order to evidence and perfect its security interest in any collateral securing the Obligations.

11. **Representations and Warranties**. To induce Purchaser to enter into this agreement and to purchase the Purchased Accounts hereunder, Seller hereby represents and warrants to Purchaser

Initial_____

as follows (each of which representations and warranties shall be deemed to be continuing and to have been restated and reaffirmed on each occasion that Seller submits a Schedule of Accounts to Purchaser):

11.1. it is fully authorized to enter into this agreement and to perform hereunder;

11.2. this agreement constitutes a legal and valid obligation that is binding upon it and that is enforceable against it in accordance with the terms hereof.

11.3. Seller is solvent and in good standing in the state of its organization.

11.4. there are no pending actions, suits, or other legal proceedings of any kind (whether civil or criminal) now pending (or, to Seller's knowledge, threatened) against Seller, the adverse result of which would in any material respect affect the property or financial condition, or threaten the continued operations, of Purchaser;

11.5. Seller has not conducted business under or used any other name, whether legal or fictitious;

11.6. each financial statement of Seller provided to Purchaser, whether provided prior to or after the date of this agreement, is true and correct in all material respects.

11.7. The Purchased Accounts are and will remain:

11.7.1. bona fide existing obligation created by the sale and delivery of goods or the rendition of services in the ordinary course of Seller's business; and

11.7.2. unconditionally owed and will be paid to Purchaser without defenses, disputes, offsets, counterclaims, or rights of return or cancellation;

11.8. Purchaser has not received notice of actual or imminent bankruptcy, insolvency, or material impairment of the financial condition of any applicable Account Debtor regarding Purchased Accounts.

12. **Default**.

12.1. **Events of Default**.  The occurrence or existence of any of the following events or conditions shall constitute an Event of Default hereunder: (a) Seller defaults in the payment of any of the Obligations or in the performance of any provision hereof or of any other agreement now or hereafter entered into with Purchaser, or any warranty or representation contained herein proves to be false in any way, howsoever minor, (b) Seller or any guarantor of any of the Obligations becomes subject to any debtor-relief proceedings, including by way of the commencement of any petition for relief filed by or against Seller or any guarantor under any chapter of the federal bankruptcy laws, (c) any such guarantor fails to perform or observe any of such guarantor's obligations to Purchaser or shall notify Purchaser of its intention to rescind, modify, terminate, or revoke any guaranty of any of the Obligations, or any such guaranty shall cease to be in full force and effect for any reason whatever, (d) Purchaser for any reason, in good

Initial_____

faith, deems itself insecure with respect to the prospect of repayment or performance of any of the Obligations.

**12.2. Waiver of Notice.** SELLER WAIVES ANY REQUIREMENT THAT PURCHASER INFORM SELLER BY AFFIRMATIVE ACT OR OTHERWISE OF ANY ACCELERATION OF SELLER'S OBLIGATIONS HEREUNDER. FURTHER, PURCHASER'S FAILURE TO CHARGE OR ACCRUE INTEREST OR FEES AT ANY "DEFAULT" OR "PAST DUE" RATE SHALL NOT BE DEEMED A WAIVER BY PURCHASER OF ITS CLAIM THERETO.

**12.3. Effect of Default.**

12.3.1. Upon the occurrence of any Event of Default, in addition to any rights Purchaser has under this agreement or applicable law:

    12.3.1.1. Purchaser may immediately terminate this agreement, at which time all Obligations shall immediately become due and payable without notice, and

    12.3.1.2. the Default Charge shall accrue and be payable on any Obligation not paid when due.

**13. Termination; Effective Date.** This agreement will be effective when executed by Purchaser, will continue in full force and effect for one (1) year thereafter, and shall be further annually extended automatically unless Seller shall have given Purchaser written notice of its intention to terminate at least sixty (60) days prior to each such anniversary, whereupon this agreement shall terminate on said anniversary.

**14. Enforcement.** This agreement and all agreements relating to the subject matter hereof are the product of negotiation and preparation by and among each party and its respective attorneys, and shall be construed accordingly. Accordingly, no provision of this agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial party by reason of such party having, or being deemed to have, structured, drafted, or dictated such provision.

**15. Amendment.** Neither this agreement nor any provisions hereof may be changed, waived, discharged, or terminated, nor may any consent to the departure from the terms hereof be given, orally (even if supported by new consideration), but only by an instrument in writing signed by all parties to this agreement. Any waiver or consent so given shall be effective only in the specific instance and for the specific purpose for which given.

**16. No Lien Termination Without Release.** In recognition of the Purchaser's right to have its attorneys' fees and other expenses incurred in connection with this agreement secured by the Collateral, notwithstanding payment in full of all Obligations by Seller, Purchaser shall not be required to record any terminations or satisfactions of any of Purchaser's Liens on the Collateral unless and until Seller has executed and delivered to Purchaser a general release in a form reasonably satisfactory to Purchaser. Seller understands that this provision constitutes a waiver of its rights under §§9-509(d)(2) and 9-513 of the UCC.

Initial_____

17. **Account Stated**. Purchaser shall render to Seller a statement setting forth the transactions arising hereunder. Each statement shall be considered correct and binding upon Seller as an account stated, except to the extent that Purchaser receives, within thirty (30) days after the mailing of such statement, written notice from Seller of any specific exceptions by Seller to that statement, and then it shall be binding against Seller as to any items to which it has not objected.

18. **Conflict**. Unless otherwise specifically stated in any other agreement entered into between Purchaser and Seller hereafter, if a conflict exists between the provisions of this agreement and the provisions of such other agreement, the provisions of this agreement shall control.

19. **Survival**. All representations, warranties, and covenants contained in this agreement shall be and remain effective for so long as this agreement has not been terminated in accordance with its terms or any of the Obligations remain outstanding

20. **No Waiver; Cumulative Nature of Rights and Remedies**. No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power, or remedy which Purchaser may have, nor shall any such delay be construed to be a waiver of any of such rights, powers, or remedies, or any acquiescence in any breach or default hereunder; nor shall any waiver by Purchaser of any breach or default by Seller hereunder be deemed a waiver of any default or breach subsequently occurring. All rights and remedies granted to Purchaser hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of action begun to enforce, any such right or remedy. The rights and remedies specified herein are cumulative and not exclusive of each other or of any rights or remedies which Purchaser would otherwise have. Any waiver, permit, consent or approval by Purchaser of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing and only as to that specific instance.

21. **Severability**. In the event any one or more of the provisions contained in this agreement is held to be invalid, illegal, or unenforceable in any respect, then such provision shall be ineffective only to the extent of such prohibition or invalidity, and the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

22. **Relationship of Parties**. The relationship of the parties hereto shall be that of Seller and Purchaser of Accounts, and Purchaser shall not be a fiduciary of the Seller, although Seller may be a fiduciary of Purchaser.

23. **Reimbursement of Expenses**. Seller agrees to reimburse Purchaser on demand for the actual amount of all costs and expenses, including attorneys' fees, which Purchaser has incurred or may incur in (a) negotiating, preparing, or administering this agreement and any documents prepared in connection herewith, all of which shall be paid contemporaneously with the execution hereof, and (b) protecting, preserving, or enforcing any Lien, security interest, or other right granted by Seller to Purchaser or arising under applicable law, whether or not suit is brought. Any such costs and expenses incurred subsequent to the execution hereof shall become part of the Obligations when incurred and may be added to the outstanding principal amount due hereunder.

Initial_____

24. **Entire Agreement**.  This agreement supersedes all prior or contemporaneous agreements and understandings between said parties, verbal or written, express or implied, relating to the subject matter hereof.  No promises of any kind have been made by Purchaser or any third party to induce Seller to execute this agreement.  No course of dealing, course of performance or trade usage, and no parole evidence of any nature, shall be used to supplement or modify any terms of this agreement.

25. **Choice of Law**.  This agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the State of Florida.

26. **Construction of Agreement.**  Notwithstanding anything to the contrary set forth in this agreement, in no event shall the rate or amount of fees or other charges that are deemed interest under applicable law and that are charged or collected hereunder exceed the maximum amount chargeable under applicable law (it being the intent hereof that Purchaser not contract or receive and Seller not pay interest in excess of the maximum authorized by applicable law); and, if a court of competent jurisdiction determines that Purchaser has charged or collected interest in excess of the highest lawful rate, Purchaser shall promptly refund such excess to Seller and shall not otherwise be penalized.

27. **JURY TRIAL WAIVER.  IN RECOGNITION OF THE HIGHER COSTS AND DELAY WHICH MAY RESULT FROM A JURY TRIAL, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (a) ARISING HEREUNDER, OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.**

28. **Venue; Jurisdiction**.  The parties agree that any suit, action, or proceeding arising out of the subject matter hereof, or the interpretation, performance, or breach of this agreement, shall, if Purchaser so elects, be instituted in the United States District Court for the Southern District of Florida or any court of the State of Florida located in Palm Beach County (each an "Acceptable Forum").  Each party agrees that the Acceptable Forums are convenient to it, and each party irrevocably submits to the jurisdiction of the Acceptable Forums, irrevocably agrees to be bound by any judgment rendered thereby in connection with this agreement, and waives any and all objections to jurisdiction or venue that it may have under the laws of the State of Florida or otherwise in those courts in any such suit, action, or proceeding.  Should such proceeding be

Initial_____

initiated in any other forum, Seller waives any right to oppose any motion or application made by Purchaser as a consequence of such proceeding having been commenced in a forum other than an Acceptable Forum.

29. **Notice**.

29.1. All notices required to be given to any party other than Purchaser shall be deemed given upon the first to occur of (i) deposit thereof in a receptacle under the control of the United States Postal Service, properly addressed and postage prepaid, (ii) transmittal by electronic means to a receiver under the control of such party; or (iii) actual receipt by such party or an employee or agent of such party.

29.2. All notices required to be given to Purchaser hereunder shall be deemed given upon actual receipt by a responsible officer of Purchaser.

29.3. For the purposes hereof, notices hereunder shall be sent to the following addresses, or to such other addresses as each such party may in writing hereafter indicate:

**SELLER**

ADDRESS:

OFFICER:

FAX NUMBER:

**PURCHASER**

ADDRESS:        101 NE 3rd Ave, Suite 1210
                Fort Lauderdale, FL 33301
OFFICER:        Mr. Michael Rossi, President
FAX NUMBER:     954-524-3533

30. **Counterparts**. This agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this agreement by facsimile shall be effective as delivery of a manually executed counterpart of this agreement, and any party delivering such an executed counterpart of the signature page to this agreement by facsimile to any other party shall thereafter also promptly deliver a manually executed counterpart of this agreement to such other party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this agreement.

31. **Definitions**. The following terms used herein shall have the following meanings. All capitalized terms not herein defined shall have the meaning set forth in the UCC:

Initial_____

31.1. **"Avoidance Claim"** – any claim that any payment received by Purchaser from or for the account of an Account Debtor is avoidable under the Bankruptcy Code or any other debtor relief statute.

31.2. **"Balance Subject to Funds Usage Fee"** - the unpaid Face Amount of all Purchased Accounts.

31.3. **"Business Day"** – a day of the week other than a Saturday, Sunday, or a holiday under which banks located in the State of Florida are required or permitted to be closed.

31.4. **"Clearance Days"** –Business Days for all payments.

31.5. **"Collateral"** - all now owned and hereafter acquired personal property and fixtures, and proceeds thereof, (including proceeds of proceeds) including without limitation:

31.5.1. Accounts, including health-care insurance receivables;

31.5.2. Chattel Paper;

31.5.3. Inventory;

31.5.4. Equipment;

31.5.5. Instruments, including Promissory Notes;

31.5.6. Investment Property;

31.5.7. Documents;

31.5.8. Deposit Accounts;

31.5.9. Letter of Credit Rights;

31.5.10. General Intangibles; and

31.5.11. Supporting Obligations.

31.6. **"Credit and Collection Services"** - shall include the following services performed by Purchaser on behalf of Seller as a result of the purchase of accounts hereunder:

31.6.1. All accounts receivable record keeping, including the recording of invoices and payments;

31.6.2. Collection of accounts;

31.6.3. Setting of such credit limits for sales by Seller as may be required.

31.7. **"Default Charge"** – The maximum default rate allowable by law

Initial_____

31.8. **"Early Termination Fee"** – One quarter of one percent (¼%) of the Maximum Amount for each month remaining prior to the maturity of the term of this Agreement if:

31.8.1 Seller terminates this Factoring Agreement prior to its maturity or;

31.8.2 Purchaser terminates this Factoring Agreement due to a Default by Seller.

31.9. **"Eligible Account"** - an Account which is acceptable for purchase as determined by Purchaser in its sole discretion.

31.10. **"Events of Default"** - See Section 12.1

31.11. **"Face Amount"** - the face amount due on an Account.

31.12. **"Funds Usage Fee"** – the product of the Funds Usage Fee Rate and the Balance Subject to Funds Usage Fee.

31.13. **"Funds Usage Fee Rate"** –_____ (0.00) percent in excess of the Prime Rate, not less than 7.0%, calculated on the basis of the actual number of days elapsed in a year of 360 days.

31.14. **"Initial Fee"** - the fee earned by Purchaser in consideration of its performance of Credit and Collection Services, computed as the Initial Fee Percentage multiplied by the Face Amount of each Purchased Account.

31.15. **"Initial Fee Percentage"** –0.00% Waived.

31.16. **"Late Payment Date"** – the date which is sixty (60) days from the date on which the Purchased Account was due.

31.17. **"Lien"** - any interest in property securing an Obligation owed to, or a claim by, a person other than the owner of the property, whether such interest is based upon common law, statute, or contract.

31.18. **"Maximum Amount"** – $000,000.00.

31.19. **"Misdirected Payment Fee"** - fifteen (15%) percent of the amount of any payment on account of a Purchased Account which has been received by Seller and not delivered in kind to Purchaser on the next Business Day following the date of receipt by Seller.

31.20. **"Missing Notation Fee"** – 15% of the Face Amount.

31.21. **"Obligations"** - all present and future obligations owing by Seller to Purchaser whether or not for the payment of money, whether or not evidenced by any note or other instrument, whether direct or indirect, absolute or contingent, due or to become due, joint or several, primary or secondary, liquidated or unliquidated, secured or unsecured, original or renewed or extended, whether arising before, during, or after the commencement of any bankruptcy case in which Seller is a Debtor, including but not limited to any obligations arising pursuant to letters of credit or acceptance transactions or any other financial accommodations.

Initial_____

31.22. **"Prime Rate"** – The prime rate published by The Wall Street Journal, from time to time as its prime rate, whether or not such rate is the lowest or best rate quoted by such bank to its most creditworthy customers. Seller acknowledges that such bank charges interest at, above, and below its announced prime rate.

31.23. **"Purchase Price"** - the unpaid Face Amount of an Account at the time of purchase.

31.24. **"Purchased Accounts"** - Accounts purchased hereunder which have not been Repurchased.

31.25. **"Purchase Date"** – The date on which Seller has been advised that Purchaser has agreed to purchase an Account.

31.26. **"Repurchased"** - an Account has been repurchased when Seller has paid to Purchaser the then unpaid Face Amount.

31.27. **"Required Reserve Amount"** - the Reserve Percentage multiplied by the unpaid Face Amount of Purchased Accounts.

31.28. **"Reserve Account"** - an account or accounts on the books of Purchaser reflecting transactions hereunder.

31.29. **"Reserve Percentage"** –_ (00.00) percent, which percent may be revised at any time by Purchaser to protect Purchaser with regard to (i) any indebtedness owing by Seller hereunder, or (ii) possible returns, claims or defenses of any Account Debtor.

31.30. **"Reserve Shortfall"** - the amount by which the Reserve Account is less than the Required Reserve Amount.

31.31. **"Schedule of Accounts"** - a form supplied by Purchaser from time to time wherein Seller lists such of its Accounts as it requests that Purchaser purchase under the terms of this agreement.

31.32. **"Seller's Deposit Account"** - any demand deposit account maintained by Seller, or represented by an employee of Seller to be maintained by Seller, wherever located.

31.33. **"Service Charge"** - a fee earned by Purchaser in consideration of its performance of Credit and Collection Services, for each thirty (30) day period the Purchased Account is unpaid in whole or in part, computed from the Purchase Date (each, a "Service Charge Period"), and not Repurchased, as follows:

Service Charge
0.00%

31.34. **Service Charge Period"** - See definition of Service Charge.

31.35. **"UCC"** - the Uniform Commercial Code (or any successor statute) as adopted and in force from time to time in the State of Florida or, when the laws of any other state govern the

Initial_____

method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code (or any successor statute) as adopted and in force from time to time in such state.

    IN WITNESS WHEREOF, the Parties have executed this agreement on the day and year first above written.

SELLER:                              ABC CORP


                                     By: _____

                                     Name: _____

                                     Title: _____

PURCHASER:                           PARAGON FINANCIAL GROUP, INC.


                                     By: _____
                                            Jon Anselma, Managing Partner


                                    14                              Initial_____

| NAME | ADDRESS | CITY, ST | ZIP | Phone | Loan Amount | Quarterly Interest Payment |
|---|---|---|---|---|---|---|
| Philip R. Zanone | | | | | 36,000 | 540.00 |
| Philip R. Zanone, Jr. | | | | | 16,000 | 240.00 |
| Irwin L. Zanone | | | | | 36,000 | 540.00 |
| Briland Venture Capital, LP | | | | | 264,000 | 3,960.00 |
| Terry Lynn McFarland | | | | | 32,000 | 480.00 |
| Lewis K. McKee Jr. | | | | | 16,000 | 240.00 |
| Gregory C. Firtik | | | | | 16,000 | 240.00 |
| Stephen W. Nelson | | | | | 16,000 | 240.00 |
| J. Lester Crain, Jr | | | | | 56,000 | 840.00 |
| W. Reid Sanders | | | | | 56,000 | 840.00 |
| Joseph W. McLeary | | | | | 24,000 | 360.00 |
| Kent Wunderlich | | | | | 36,000 | 540.00 |
| Alvin Wunderlich Sr. Trust | | | | | 16,000 | 240.00 |
| H. Marcus Carter | | | | | 16,000 | 240.00 |
| J.E. Brignac, Jr. Holdings, LLC | | | | | 16,000 | 240.00 |
| Catharine Zanone Webb | | | | | 32,000 | 480.00 |
| F. Ross Johnson | | | | | 16,000 | 240.00 |
| Mary Zanone Johnson | | | | | 32,000 | 480.00 |
| Neil R. Johnson | | | | | 16,000 | 240.00 |
| W.A. Leatherman, Jr | | | | | 16,000 | 240.00 |
| Terry Pagliari | | | | | | |
| Total | | | | | 800,000 | **12,000.00** |

\*\*\* Quarterly checks are due August 27th, November 27th, February 27th, and May 27th

(personal info redacted)

Exhibit C

ESCROW AGREEMENT

WITNESSETH, this Escrow Agreement made and entered into effective this

_____ day of May, 2010, by and between the following parties:

1.  Eaton-Moery Environmental Services, Inc.,herei nafter referred to as

EMS, and

2.  H & R Farms, LLC, Harold Hill, the Estate of Marlin Reeves, and all

heirs at law of Marlin Reeves, who are  Marla DeLynn Gardner,Terry Randall

Reeves, Marlin Lynn Reeves, Danny Ray Reeves and Venedia Lynn Terrell,

hereinafter referred to collectively as H & R, and

3.  David A. Kustoff, Esq., hereinafter referred to as Escrow

Agent.

Whereas,EMS and H & R have entered into a Settlement Agreement of

their litigation in the Chancery Court of Shelby County, Tennessee, being Cause

No. CH-06-1835-3, and

Whereas, that Settlement Agreement calls for the engagement of an

Escrow Agent to hold and distribute funds and documents according to a specific

schedule.

Page 1 of 4

Exhibit "D"

Now therefore, the parties do hereby agree as follows:

1.  EMS will deposit with the **Escrow Agent** a fully executed Quit Claim Deed, in a form approved by H & R's counsel, conveying the property located at 500 Plum in Memphis, TN to H & R.

2.  H & R will deposit with **Escrow Agent** a fully executed Quit Claim Deed, in a form approved by EMS's counsel, conveying the property located at 500 Plum St. in Memphis, TN to EMS.

3.  EMS will deliver to **Escrow Agent** three (3) certified checks, payable to H & R, in the amount of Fifty Thousand ($50,000.00), as follows:

    (a) One check <u>delivered</u> on or before July 1, 2010.

    (b) One check <u>delivered</u> on or before August 1, 2010, and

    (c) One check <u>delivered</u> on or before September 1, 2010.

4.  As each check is received by **Escrow Agent**, he shall deliver the check to Harold G. Walter, Esq., counsel for H & R.

5.  If any check is not received by **Escrow Agent** on or before the above

scheduled due date, **Escrow Agent** shall deliver both Quit Claim Deeds to Harold

G. Walter, counsel for **H & R,** and t.his Escrow Agreement is then terminated.

6.  If all checks are received by **Escrow Agent** on or before the above

scheduled due dates, **Escrow Agent** shall deliver both Quit Claim Deeds to Porter

Feild, Esq., counsel for EMS and this Escrow Agreement is then terminated.

7.  At the signing of this Agreement.EMS and H & R will jointly pay

**Escrow Agent** the sum of One Thousand ($1,000.00) Dollars for his services.

8.  EMS and H & R hereby release and discharge Escrow Agent from any

and all liability of whatsoever nature, whether arising in tort, contract or other,

except for enforcement or breach of this agreement.  EMS and H & R covenant

that they will not sue Escrow Agent except as may be necessary to uphold the

rights of each under this agreement.

EATON-MOERY ENVIRONMENTAL SERVICES, INC.

By: _____

Title: _Presiden t_ _____

H & R FARMS, LLC

By: _____

Title: _____

Page 3 of 4

_____

Harold Hill


_____

Marla DeLynn Gardner


_____

Terry Randall Reeves


_____

Marlin Lynn Reeves

_____

Danny Ray Reeves

_____

Venedia Lynn Terrell

_____
Harold Hill

_____
Marla DeLynn Gardner

*Terry Randall Reeves*
Terry Randall Reeves

_____
Marlin Lynn Reeves

_____
Danny Ray Reeves

_____
Venedia Lynn Terrell

_____
Harold Hill


_____
Marla DeLynn Gardner


_____
Terry Randall Reeves

_____
Marlin Lynn Reeves


_____
Danny Ray Reeves


_____
Venedia Lynn Terrell

_____
Harold Hill

_Marla DeLynn Gardner_
Marla DeLynn Gardner

_____
Terry Randall Reeves

_____
Marlin Lynn Reeves

_____
Danny Ray Reeves

_____
Venedia Lynn Terrell