IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRIC OF ARKANSAS
HELENA DIVISION

EATON MOERY ENVIRONMENTAL SERVICES, INC      CHAPTER 11
D/B/A DELTA ENVIRONEMNTAL     Case No. 2:10-bk-14713
FED ID 62-1687001

**DEBTOR'S DISCLOSURE STATEMENT TO ACCOMPANY
ITS PLAN OF REORGANIZATION DATED AS OF MARCH 24, 2011**

> **THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

The Debtor, Eaton Moery Environmental Services, Inc. (hereinafter referred to as the Debtor) in accordance with the provisions of 11 U.S.C.§1129(a)(11), filed a voluntary Chapter 11 on June 30, 2010 with the United States Bankruptcy Court, Eastern District of Arkansas. Since the Filing Date, the Debtor has remained in possession of its assets and has continued to own, operate and manage its business affairs pending the approval of a Plan of reorganization in accordance with the provisions of Title 11 of the United States Code (the "Bankruptcy Code").

Pursuant to Section 1125 of the Bankruptcy Code, the Debtor now files this Disclosure Statement (the "Disclosure Statement") relating to its proposed Plan of reorganization dated March 24, 2011 (the "Plan").

No representations concerning the Debtor, the estimated value of the Debtor's property and/or the estimated assets to be generated from the liquidation of the Debtor's assets, are authorized by the Debtor other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance which are other than as contained in this Disclosure Statement, should not be relied upon by you in casting your vote with respect to the proposed Plan.

The debtor believes that the Plan provides the greatest and earliest possible recoveries to all creditors under the circumstances. The debtor therefore believes that acceptance of the Plan is in the best interest of each and every class of creditors and recommends that you vote to accept the Plan.

This Disclosure Statement is based upon information available to the Debtor as of March 24, 2011, and does not reflect events that may occur subsequent to that date, which may have a material impact on the information contained in this Disclosure Statement. The Debtor will not make any effort to supplement or amend this Disclosure Statement to reflect changes subsequent to the date hereof.

This document was compiled from information obtained by the debtor from numerous sources believed to be accurate to the best of the debtor's knowledge, information and belief. However, the debtor and its advisors do not represent or warrant that this Disclosure Statement is complete or that the information contained herein is free from any inaccuracy or omission.

Nothing in this disclosure statement is or shall be deemed to be an admission or a declaration against interest by the debtor for purposes of any existing or future litigation, but rather as statements made in settlement negotiations governed by rule 408 of the Federal Rules of Evidence and any other statute or rule of similar import.

CAUTIONARY STATEMENT

Certain information included in this Disclosure Statement contains forward-looking statements within the meaning of the securities act of 1933, as amended, the securities exchange act of 1934, as amended, and the private securities litigation reform act of 1995, as amended. Such forward-looking information is based on information available when such statements are made and is subject to risks and uncertainties that could cause actual results to differ materially from those expressed in this Disclosure Statement.

THE DEBTOR AND ITS OPERATIONS

1.      Introduction and Reason for Filing Chapter 11

In the spring of 2008 the Advisory Board recommended raising 800,000 in a capital call to all Preferred Stockholders.  This capital would come in the form of an unsecured note.  The money would be used to construct a new disposal cell and also remove an overfill in the DeWitt Landfill.

These projects were completed and all compliance issues were resolved.  The note required us to make quarterly interest payments bearing interest at 6% which we paid in a timely fashion.  This note was unsecured and did not have any assets for collateral.  Also, there were warrants attached to the note that

gave the note holders the right to purchase common stock at $125.00 per share or they could relinquish the debt for the shares.

Once all compliance issues were resolved and the new cell opened, the company was operating profitably and servicing all obligations. Additionally, we had over $400,000 in savings to be used for our next cell expansion or equipment purchases. In the spring of 2009 an opportunity became available to purchase the WCA Jonesboro operation. This company was doing approximately $3.5 million in annual revenue and could be purchased for $2.9 million. Debtor approached the Advisory Board which is made up of preferred stockholders. They instructed me to not worry about how to get the money just go get the deal under contract. Debtor was able to get the WCA operation under contract. Wunderlich Securities approached us about underwriting a $12 million dollar public bond offering to refinance all our debs, and supply capital for the WCA acquisition. On three separate occasions we met with Wunderlich in order to get some assurances that they could sell the bonds and raise the money. In all three meetings they assured us they could do it.

Based on these meetings the Advisory Board recommended we proceed with the bond offering. In an effort to expedite the offering, we employed attorneys and accountants to prepare the offering and expended well over $250,000 to prepare the offering. It was during this time that Wunderlich came back to us and told us we wouldn't qualify for a public debt offering, and that they couldn't sell the bonds unless they were publicly traded. The Advisory Board at this time began trying to raise capital calls among themselves.

Finally in September 2009, a meeting was called and Mr. Eaton was advised he needed to step down as CEO in order to appease certain stockholders and that was the only way to raise the money needed for the WCA acquisition. Mr. Eaton was asked to stay and run the company but move the corporate office to Memphis and report daily to Steve Nelson, the new CEO. Mr. Eaton decided at this time that he would resign and they could pursue the acquisition without him. After Eaton left the company, the Advisory Board decided not to fund the WCA acquisition, leaving the company saddled with all the expenses of due diligence and nothing to show for it.

During the next five months under Steve Nelson's leadership, the Sales Director Byron Neal was fired, and Carole McClain, the company Controller was reassigned, and Mike Barkley was hired to run day to day operations. During this five month period, the company lost $1.1 million, and to aggravate the losses even more, the expenses accrued on the income statement such as disposal fees, employment taxes, solid waste disposal taxes and equipment rentals went paid. In February 2010, Steve Nelson resigned as CEO. On March 1, 2010, Barkley and his appointees quit. At this time, Mr. Eaton contacted Mr. Bryan Moery (Secretary of the Corporation, Stockholder and Guarantor on Bond Note). Mr. Eaton advised him

of his concern that the Preferred Stockholders would intentionally default on the bond debt in order to force Mr. Eaton to make the payment to protect his guarantee.

Mr. Moery set up a meeting with the stockholders' attorney, Rusty Hensley, and Nelson indicated that they had abandoned the company. The bond payment or any other obligations were not going to be paid. If Mr. Eaton and Mr. Moery wanted to try and save it, they were invited to make an offer. The parties offered to pay $6 million for the company which represented $4.5 million for the bond; $800,000 in accounts payable and whatever is left up to $6.0 million would be payable to the preferred stockholders in exchange for their stock and unsecured note.

After verbally agreeing to the terms, the purchasing parties asked that no money be moved and all accounts be left just as they were. On the following Monday, Lana Parks ,accounts receivable clerk phoned Mr. Eaton to tell me that Nelson and Barkley had diverted over $206,000 from our normal operating account in Wynne, AR. The diversion was tracked to a bank in Memphis, Tennessee, that day, and Debtor went over to demand the return of the money. Debtor contacted the attorney Rusty Hensley to find out why they diverted funds, and he stated it was just a miscommunication. Debtor was only able to retrieve $102,000 of the funds and Debtor (and Mr. Eaton) believed the preferred stockholders should have to return the other $104,000.

Debtor is concerned that this diversion of funds could be a criminal act due to our operating account in Wynne, Arkansas, being a secured lock box account. Any unauthorized withdrawal or diversion from this account would be a violation of the security agreement. These funds that were diverted were accounts receivable that are security for the bond and required to be deposited in the operating account at the First National Bank of Wynne.

Since Mr. Eaton's return to the company on March 3, 2010, Debtor has made significant progress in improving the company's operating margins; however, Debtor is having difficulty paying past due vendors and taxing authorities that were not paid during Mr. Eaton's absence. In May 2010, Debtor began seeking financing to pay off past due vendors and taxing authorities. In late May, Debtor received a loan commitment on $800,000 to be secured by equipment that was unencumbered. Upon receiving closing papers, it was revealed that the preferred stockholders, known as Delta Environmental Investment, LLC, had taken a lien against the company assets during that period of time Glen Eaton was not at the company.

Debtor approached the investors about releasing the lien on the equipment in order to close the loan and recapitalize the company. The investors refused and suggested that Debtor file bankruptcy because they were not going to release their lien.

Thus, the present situation is that Debtor is unable to access collateral to borrow money, no stockholders are willing to put any capital in the company, and the bondholders are unwilling to release accounts receivable for a working capital loan. Therefore, Debtor has no way of accessing new capital to pay past due vendors or delinquent taxes. The factoring arrangement with Paragon, recently approved by this Court, will alleviate this situation to some extent.

Debtor is able to "self fund" the on going business with accounts receivables, but Debtor is unable to pay past due vendors without Chapter 11 restructuring and terming out these debts.

## PLAN OF REORGANIZATION

The following is a summary of the Plan of the Debtor. All capitalized terms are defined in the Plan. If any discrepancy appears between the Plan and this Disclosure Statement, the Plan will control.

All Claims or interests are placed in a particular Class as set forth below. A Claim or interest is placed in a Class only to the extent that the Claim or interest falls within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or interest falls within the description of such other Class or Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

2.01 Class I Claims (Administrative Expenses). Class I Claims include administrative fees and expenses for professionals hired with approval of the Court. These fees are subject to Court approval but shall be paid by the Debtor upon approval of the Plan post-petition. Also included in Class I are the fees of the U.S. Trustee.

2.02 Class II (Priority Tax Claims). The Allowed Priority Tax Claim of the IRS was $268,099.38 as of Filing Date. Although the schedules reflect this claim at $135,000, the $268,099.38 was figured by reducing the IRS' claim by penalties assessment. State sales taxes were owed on the filing date in the sum of $55,682.70.

2.03 Class III (Priority Non-tax claims). ADEQ Disposal fees were owed on the filing date in the sum of $58,000.00. The United States Labor Department is owed $33,610.77, based on a post-petition audit performed by the Department of Labor.

2.04 Class IV (The Bank of The Ozarks). This class claim consists of the Allowed Secured Claim of The Bank of the Ozarks of $4,210,000.

2.05 Class V (H & R Farms Property Settlement). This class consists of the Allowed Secured Claim of H & R Farms Property Settlement of $150,000.

2.06 Class VI (Landfill Priority Vendors). This class consists of the Allowed Priority Unsecured claim of Landfills in the approximate amount of $654,920.

2.07    Class VII (DEI, LLC, Glen Eaton, Bryan Moery).    This class represents debt owed to insiders totaling $870,000.  These insiders typically would be entitled to any recovery above the liquated value of the company assets.  In Chapter 7 liquidation the net value of the company assets would be less than the $4,210,000 owed to the creditor The Bank of the Ozarks.  The Class III lender is owed approximately $4.2 million; the debtor's assets are worth approximately $3.8 million; therefore, there is no value over and above the creditor debt to secure the DEI, LLC note.  Further, Debtor contends that any claim by insiders on Company assets and or income will dilute the Company's ability to pay legitimate secured and unsecured creditors.  Eaton and Moery have voluntarily chosen to waive their claims of $10,000 and $60,000, respectively.  The twenty-one investors who hold notes totaling $800,000 are members of DEI, LLC.  Debtor asserts their claims are entitled to no distribution based on Sec. 510(c)(1)(equitable subordination).

2.08    Class VIII (Unsecured Claims).    This class consists of all Allowed Unsecured Claims, the amount of which is $463,000 according to the Debtor's schedules.

2.09    Class IX (Equity Security Holders).    This class consists of the shareholders of Debtor, to wit, (A.) Common Stockholders: Glen Eaton, Bryan Moery, and Bob Ford (B.) Preferred Stockholders: DEI, LLC; and Bryan Moery.

## LIQUIDATION SCENARIO

The Debtor believes this Plan gives creditors the best opportunity to receive the greatest dividend.  As usual in these circumstances, a liquidation would result in unsecured creditors receiving no dividend; the secured creditors experience potential deficiency; and the employees' loss of jobs.  Exhibit "F" to the Plan of Reorganization describes liquidation values.

## OTHER FINANCIAL INFORMATION

Cash flow data and the past twelve months' income and expenses are attached as exhibits to the accompanying Plan of Reorganization.

Eaton Moery Environmental Services, Inc.

Dowden Law Firm, P. A.

By: /s/ James F. Dowden
James F. Dowden  (#77046)
212 Center St.; 10th Floor
Little Rock, AR 72201
(501) 324-4700